## No. 27448

**Governor Richard Lamm, State Treasurer Sam Brown, Secretary of State Mary Estill Buchanan, Attorney General J. D. MacFarlane, and State Auditor John Proctor, acting as the State Board of Equalization v. Ray Barber, Clear Creek County Assessor, Eugene Drinkhouse, Garfield County Assessor, and Fred Fernandez, Las Animas County Assessor**

(565 P.2d 538)

Decided March 4, 1977.

512

514

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Stephen H. Kaplan, Assistant, for petitioners.

Gerald D. Hartert, Kenneth T. Johnson, Jr., for respondents Drinkhouse and Barber.

Ernest U. Sandoval, Luis Lopez, District Attorney, Third Judicial District, for respondent Fernandez.

Robert Dunlap, for amici curiae Paul Norbert Larson and Connie Lee Larson.

*En Banc.*

MR. JUSTICE CARRIGAN delivered the opinion of the Court.

The respondents, three county assessors, have refused to implement increases in their respective assessment abstracts as ordered by the State Board of Equalization (hereinafter referred to as State Board). The State Board, as petitioner, seek enforcement of that order in this original proceeding. We issued a rule to show cause why mandamus should not issue to compel the respondents to effectuate the ordered increases. We now make the rule absolute.

The state constitution provides:

"As may be provided by law, the state board of equalization shall review the valuations determined for assessment of taxes upon the various classes of real and personal property located in the several counties of the state, and shall raise, lower and adjust the same, to the end that all valuations for assessment of taxes shall be just and equalized; provided, however, that said state board of equalization shall have no power of original assessment." *Colo. Const.* Art. X, Sec. 15.

The state constitution further requires the State Board of Equalization to "perform such other duties as may be prescribed by law." *Id.*

In an apparent effort to achieve in one year statewide equalization of property assessments at approximately 22 per cent of actual value, the General Assembly enacted a statute, which took effect June 10, 1976, providing in part:

"39-9-103. Duties of board — enforcement.

* * * *

"(5)(a) For abstracts of assessment certified to the state board of equalization in 1976, the state board of equalization shall determine whether the aggregate valuation for assessment for any class or subclass of agricultural building improvements or residential improved or unimproved property or commercial improved or unimproved property or industrial improved or unimproved property is lower than or exceeds twenty-two percent of actual value.

* * * *

"(II) The state board of equalization shall order an increase or a decrease in the aggregate valuation for assessment of any class or subclass of agricultural building improvements or residential improved or unimproved property which is more than two percentage points above or below twenty-two percent of actual value so that such valuation equals twenty-two percent of actual value. The state board of equalization shall order an increase or a decrease in the aggregate valuation for assessment of any class or subclass of commercial improved or unimproved property or industrial improved or unimproved property which is more than three percentage points above or two percentage points below twenty-two percent of actual value so that such valuation equals twenty-two percent of actual value. If the aggregate valuation for assessment of any classes or subclasses of property specified in this subparagraph (II), in any abstract of assessment certified in 1976, is within the range of percentage points specified for such respective classes or subclasses of property, the same shall be deemed to comply with the requirements of law and shall not be increased or decreased.

"(III) Any reduction ordered by the state board of equalization may be applied by the assessor proportionately to each property within such class or subclass. *Any increase ordered* by the state board of equalization

*shall be achieved by the assessor only by changes to individual valuations for assessments* of property within such class or subclass. . . . It is the *intent of the general assembly* in enacting this paragraph (b), *to modify for one year only* the percentage relationship in the assessment of the specified properties and only for the purpose of the actions of the state board of equalization pursuant to this subsection (5). It is the intent of the general assembly to preserve in the future the equal percentage of assessment for such classes and subclasses of property. *Effective January 1, 1977, paragraphs (a) and (b) of this subsection (5) are repealed*" (emphasis added). Colo. Sess. Laws 1976, ch. 154, § 39-9-103 at 763-64 (hereinafter sometimes referred to as the 1976 Act). Section 39-9-103(5) (1976 Supp.).

The 1976 Act explicitly defined the term "actual value." *See* Colo. Sess. Laws 1976, ch. 154, section 39-9-103(5)(b)(I) at 764. Pursuant to this statutory mandate, and after complying with the required procedures,[1] the State Board held hearings and ordered 45 county assessors to adjust their respective aggregate assessment valuations. Forty-two assessors apparently complied, but the three respondents did not.

The State Board made a finding of fact that the respondent assessors were not in compliance with its order. The respondents admit the correctness of this finding that they have not obeyed or implemented the State Board's order and assert that they do not intend to comply unless so ordered by this court.[2] To justify their refusal to carry out the State Board's order, they challenge the constitutionality of the above-quoted 1976 Act and the State Board's action pursuant to that Act.

## I. *Propriety of Mandamus Remedy*

The respondent assessors, while not contesting this court's authority or original jurisdiction to issue writs in the nature of mandamus,[3] contend that mandamus is inappropriate here. First, they argue that the action sought to be compelled is discretionary and that mandamus may not be used to compel the exercise of discretion.

Prior to the 1976 Act,[4] county assessors were required to accomplish any State Board ordered increases in assessed valuations by making horizontal increases in the assessments of all properties. The respondents admit that their obligation under that prior act involved no discretion. The 1976 amendment, however, required *increases* in assessed valuations to be accomplished only by reassessing individual properties.[5] Respondent

---

[1] The procedures followed by the State Board of Equalization in attempting to comply with the above-quoted statute have not been challenged.

[2] It is notable that from the Act's effective date, June 10, 1976, the respondents took no action to seek judicial sanction for their claim that the Act is unconstitutional, or to test their standing to raise the question, as they might have done by seeking a declaratory judgment or writ of prohibition.

[3] *Colo. Const.* Art. VI, Sec. 3; C.A.R. 21.

[4] Colo. Sess. Laws 1976, ch. 154, 39-9-103 at 763, 764.

[5] Colo. Sess. Laws 1976, ch. 154, 39-9-103(5)(b)(III) at 764.

assessors claim that this provision grants them discretion which cannot be directed by a writ of mandamus.

Mandamus is an appropriate remedy where there has been a failure to perform a statutory duty. *County Commissioners v. Edwards*, 171 Colo. 499, 468 P.2d 857 (1970); *see Tasher v. Trentaz*, 165 Colo. 97, 437 P.2d 529 (1968). A writ of mandamus, however, may not direct *how* discretion is to be exercised. *People ex rel. Griffith v. Bundy*, 107 Colo. 102, 109 P.2d 261 (1940)(canvassing of votes); *State ex rel. Holmes v. Peck*, 92 Colo. 224, 19 P.2d 217 (1933)(certification of sufficiency of a petition); *Lindsey v. Carlton*, 44 Colo. 42, 96 P. 997 (1908) (county court's discretion in divorce proceeding); *Orman v. People*, 18 Colo. App. 302, 71 P. 430 (1903) (canvassing of votes). Nevertheless, officials in whom the law has vested a duty involving discretion may be required by mandamus to exercise that discretion. Thus, while "courts will not, by mandamus, direct the *manner* in which the discretion of an officer shall be exercised," they "will direct an officer *to proceed and exercise* the discretion vested in him by law." *People v. McNichols*, 91 Colo. 141, 143, 13 P.2d 266, 267 (1932) (duty to make an audit) (emphasis added). *See Van DeVegt v. Board of County Commissioners*, 98 Colo. 161, 55 P.2d 703 (1936) (duty to consider granting a liquor license); *State Board of Corrections v. Denver*, 61 Colo. 266, 156 P. 1100 (1916) (duty to consider caring for insane person in state hospital); *People ex rel. Pettingell v. Grand County Commissioners*, 53 Colo. 494, 127 P. 960 (1912) (duty to consider repairing bridge).

In the present case, the State Board has sought a writ of mandamus only to compel the respondent assessors to perform their statutory duty to increase the *aggregate* assessments of their respective counties. Statutes in effect for many years have imposed on county assessors a clear duty to obey such an order from the State Board. Sections 39-5-127,[6] 39-9-107,[7] C.R.S. 1973. There is no attempt through this mandamus action to direct the respondents *how* to exercise their discretion in performing their statutory duty. The discretionary aspects of the assessors' duties, therefore, would not be impeded by the issuance of a writ compelling them to exercise their discretion.

---

[6] "39-5-127. Correction of assessments. *Whenever the state board* of equalization makes any change in the abstract of assessment of any county or *orders an increase* or decrease *in the valuation of any class or subclass of property* located therein, the *assessor shall forthwith make the necessary changes* in his abstract of assessment required to carry out such an order" (emphasis added).

[7] "39-9-107. Assessment roll to conform. *Whenever the state board* of equalization *orders any change in the valuation for assessment of any class or subclass of* taxable real or personal *property* located in a county, the *assessor* thereof *shall forthwith make the proper adjustment in each individual schedule affected* by such order so that the assessment roll of his county conforms with the aggregate valuation for assessment of all taxable property located therein, as approved by said board and certified by the state auditor" (emphasis added).

Secondly, the respondent assessors claim that mandamus is inappropriate here because the statute and State Board orders are vague, ambiguous, and fail to provide adequate guidelines for the required reassessments to increase aggregate valuations. In support of this contention, the respondents argue that Colo. Sess. Laws 1976, ch. 154, 39-9-103(5)(b)(III) at 764 expressly deprives them of the normal assessment guidelines contained in Articles 1 to 13, Title 39, C.R.S. 1973.

■ Our reading of the 1976 Act leads us to reject the respondents' interpretation. The statute must be read and considered as a whole to ascertain the intent of the General Assembly. *See Howe v. People*, 178 Colo. 248, 496 P.2d 1040 (1972). Thus the 1976 amendment must be read, not in a vacuum, but in the context of the entire preexisting statutory assessment scheme. *Zaba v. Motor Vehicle Division*, 183 Colo. 335, 516 P.2d 634 (1973). If possible, a statute should be construed to accomplish the purpose for which it was enacted. The construction suggested by the respondents is illogical and would deprive the statute of its effectiveness.

■ We interpret the 1976 Act as leaving intact all the normal, preexisting guidelines provided for assessment, and these guidelines, in addition to the new guidelines set out in the 1976 Act, are available in performing any reassessment ordered by the State Board. Thus the State Board's order is not vague or ambiguous but sufficiently definite to support mandamus.

We hold that mandamus is an appropriate remedy.

## II. *Defense of Impossibility*

■ The respondents assert that a writ in the nature of mandamus cannot be issued because compliance with such a writ would be impossible. Factual impossibility is indeed a recognized affirmative defense to the issuance of a writ of mandamus. *See People v. Hively*, 139 Colo. 49, 336 P.2d 721 (1959); *Agricultural Ditch Co. v. Rollins*, 42 Colo. 267, 93 P. 1125 (1908). Factual impossibility, however, has not been shown here.

The respondents admit that "a great number of Colorado county assessors were subject to similar orders of the State Board to increase valuations and that most of these assessors have indicated their intention to comply." We cannot ignore the fact that 45 assessors were ordered to make adjustments and only these three claim the orders imposed impossible burdens. Indeed, other counties with fewer staff personnel and more properties to be reassessed have been implementing the increases ordered. The respondents, too, could have complied with the order.[8]

---

[8] Certainly the respondent assessors could have lightened their burden of compliance, without foregoing their day in court to test the statute's constitutionality, had they commenced declaratory judgment or prohibition proceedings promptly after the statute took effect on June 10, 1976. Rather they chose not to comply with the State Board's order while taking no legal action to test its validity.

■ We hold that if any impossibility is involved, it was created by delay incident to the respondents' failure to follow the State Board's order and cannot now be raised as a defense to the issuance of a writ of mandamus. *See Colorado Fuel & Iron Co. v. Adams*, 14 Colo.App. 84, 60 P. 367 (1899) (impossibility is no defense if created by the party asserting it).

### III. *Standing*

The State Board argues that the respondent assessors have no standing to challenge the constitutionality of the board's order. We agree.

■ It is well established that as a general rule, neither a county officer nor a subordinate county agency has any standing or legal authority to question or obtain judicial review of an action taken by a superior state agency. *Martin v. District Court*, 191 Colo. 107, 550 P.2d 864 (1976) (county department of social services); *Board of County Commissioners v. State Board of Social Services*, 186 Colo. 435, 528 P.2d 244 (1974) (board of county commissioners); *Board of County Commissioners v. Love*, 172 Colo. 121, 470 P.2d 861 (1970) (county commissioners, board of equalization and county assessor); *People v. Hively*, 139 Colo. 49, 336 P.2d 721 (1959) (county assessor); *People v. Pitcher*, 61 Colo. 149, 156 P. 812 (1916) (commissioner of finance); *Ames v. People*, 26 Colo. 83, 56 P. 656 (1899) (county assessor).

■ In the leading case of *Ames v. People, supra*, this court recognized that in mandamus proceedings between public officials, courts generally refuse to determine constitutionality of statutes affecting the rights of persons not before the court and decline to allow such grave questions to be raised by public officials whose duty is to perform the action required by the statute being attacked. There we set out, in the following language, the rationale underlying the general rule:[9]

"The reasons for this rule are apparent. Public policy and public necessity require prompt and efficient action from such officers [county assessors], and when intrusted with the assessment of taxes and the collection and disbursement of revenue, *they have no right to refuse to perform ministerial duties prescribed by law because of any apprehension on their part that others may be injuriously affected by it, or that the statute prescribing such duties may be unconstitutional.*" 26 Colo. at 90, 56 P. at 658 (emphasis added).

These same principles were applied in *People v. Hively, supra.* There, a county assessor challenged, on due process grounds, increases in county assessments ordered by the State Board of Equalization. This court held that the county assessor could not question but was bound to obey the

---

[9] In *Ames*, however, a special exception to the rule was appropriate.

State Board's order. There we declared:

"Thus the Assessor here had no more standing to question the validity of the action of the Board than a lower court has to question the validity of the mandate of a reviewing court. He was obligated to carry out the mandate of the Board. There is *no* legal justification for his defiance. . . . It follows that writs of mandamus and prohibition are here appropriate." 139 Colo. at 74, 336 P.2d at 735.

Recently, in *Board of County Commissioners v. Love, supra*, this court upheld and expressly followed the *Hively* holding. In *Love*, we said that, although the county officials had no standing to challenge an order of the State Board of Equalization,

"[W]e do not say that actions taken by the State Tax Commission or the State Board of Equalization are not subject to judicial review. Certainly taxpayers, who may be adversely affected or aggrieved, may have judicial review. However, such persons were not parties to the present proceeding." 172 Colo. 128, 470 P.2d at 864.

The respondent assessors here argue that the general rule should not apply to them because they are not ministerial officials. They acknowledge that if they were required to implement the ordered increases in aggregate valuation on a horizontal basis, their duty would be ministerial. However, they point out that pursuant to Colo. Sess. Laws 1976, ch. 154, 39-9-103(5)(b)(III), any "increase ordered by the state board of equalization shall be achieved by the assessor only by changes to individual valuations for assessments of property within such class or subclass." It is their contention that since they must exercise discretion in implementing each increase, they cannot be required by mandamus to implement any increase. Therefore, they argue, they are not mere ministerial officials within the rule depriving such officials of standing to contest the constitutionality of a statute or of an order of a superior state board. Finally, they argue that their discretion exposes them to ultimate liability in actions by taxpayers who may be damaged by their discretionary cooperation in *pari delicto* with the State Board in enforcing an unconstitutional statute.

The respondents are incorrect. Their argument is a house of cards resting on the assumption that they have discretion to follow or disregard the State Board's order. While it is true that they have discretion to determine the details of *how* they will implement the State Board ordered increases, they have no discretion to determine whether or not to implement them.[10] Each respondent has a clear legal duty to carry out the State Board's order by increasing the aggregate valuation of certain subclasses of property within his county. Sections 39-5-127, 39-9-107, C.R.S. 1973. Absent evidence of State Board interference with *how* discretion is exercised, case law and sound policy require issuance of a mandamus to com-

---

[10] See Part I of this opinion and the authorities there cited.

pel the defendants to perform their statutory duties. We hold that the respondents have no standing to question the constitutionality of the statute or the State Board's action in response to it.

## IV. *Constitutional Issues — Publici Juris*

The respondent assessors argue that even if they do not have standing under generally applicable law to attack the constitutionality of the statute and the State Board's orders, the matter is *publici juris*, and therefore, this court should determine the constitutional issues. This claim of public interest is based on the respondents' assertion that if taxpayers later succeed in challenging the constitutionality of the State Board's action, the counties' revenues will be insufficient. They argue that chaos could result if we do not determine whether the 1976 Act is constitutional.

We deem the matter to be of sufficient public interest and importance to require that we consider two constitutional issues which have been fully briefed and ably argued by the parties and amici curiae.

## A. *Colorado Constitution, Article X, Section 15*

It is asserted that the 1976 statute, by requiring county assessors to achieve any increase ordered by the State Board "only by changes to individual valuations for assessments of property . . . ,"[11] effectively empowers the State Board to make original assessments in violation of *Colo. Const.* Art. X, Sec. 15. That section declares that the "state board of equalization shall have no power of original assessment."

Assessment is the act of placing a value for tax purposes upon the property of a particular taxpayer. Equalization, on the other hand, is the act of raising or lowering the total valuation placed upon a class, or subclass, of property in the aggregate. Equalization deals with all the property of a class or subclass within a designated territorial limit, such as a county, without regard to who owns the individual parcels making up the class or subclass. Assessment relates to individual properties; equalization relates to classes of property collectively. *Union Pacific R. Co. v. Board of Commissioners*, 35 F.2d 785, 790 (10th Cir. 1929) (interpreting Colorado law).

Here the State Board did not attempt to single out or raise the assessed valuation of any individual taxpayer. That task was left to the county assessors. Rather the State Board dealt only with "aggregate values," and ". . . this cannot be deemed an act of original assessment." *MacGinnis v. Denver Land Co.*, 90 Colo. 72, 77, 6 P.2d 919, 921 (1931).

In our view the State Board's order here under consideration is not an original assessment. Nor does the statute under attack purport to authorize the State Board to make any original assessment. Quite the contrary, the statute, and the State Board's order, respect the county assessors' function of making original assessments. The statute plainly states

---

[11] Colo. Sess. Laws 1976, ch. 154, section 39-9-103(5)(b)(III) at 764.

that it is the *assessor* who is to make any "changes to individual valuations for assessments of property"[12] within each affected class or subclass. Neither the statute nor the State Board's order goes beyond requiring increases in "aggregate valuation for assessment of any class or subclass" of property affected.

We hold that neither the statute nor the board's order offends the constitutional proviso that the State Board have no power of original assessment.

### B. *Due Process*

Respondent assessors and amici curiae have argued that the 1976 Act's requirement that increases ordered by the State Board be achieved by county assessors only by changing "individual valuations for assessments of property"[13] denies taxpayers due process. Therefore, they contend, the statute violates the Fourteenth Amendment to the United States Constitution and Colorado Constitution, Article II, Section 25.

In essence, the respondents argue that due process requires limiting the State Board's authority to increase valuations only to "horizontal increases," *i.e.*, increases imposed proportionally on all property of a particular class or subclass in the county. It is asserted that the assessed valuation assigned to the property of an individual taxpayer may not be increased without proportionally increasing the assessed valuations of all property of that class in the county, unless the particular taxpayer whose assessment is raised is afforded a full due process hearing *before* the assessment increase.

When called upon to declare a statute unconstitutional, courts must approach their responsibility with self-restraint born of recognition that the General Assembly which has solemnly enacted the statute is an equal, coordinate branch of government. Thus courts should "never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." *Milheim v. Moffat Tunnel District*, 72 Colo. 268, 273, 211 P. 649, 651 (1922).

As Chief Justice Pringle stated in *People v. Sneed*, 183 Colo. 96, 99, 514 P.2d 776, 778 (1973), "courts do not seek reasons to find statutes unconstitutional. Rather, it is our duty to presume that the statute involved is constitutional." It is fundamental that one who asserts that a statute is unconstitutional has the burden of proving its invalidity beyond a reasonable doubt. *See, e.g., Harris v. Heckers*, 185 Colo. 40, 41, 521 P.2d 766, 768 (1974).

Where alleged denial of due process is the ground of attack upon a statute, special considerations apply. Due process is not an absolute

---

[12] *Id.*
[13] Colo. Sess. Laws 1976, ch. 154, 39-9-103(5)(b)(III) at 764.

concept. In cases such as this one, due process requires balancing the individual taxpayer's right to a fair and timely hearing regarding the increase in his assessment against the public necessity for fair assessment and prompt payment of taxes in all the counties of the state. The essence of due process is fair procedure. But no particular or perfect procedure is required so long as the elements of opportunity for hearing and judicial review are present.

We are not unmindful of the General Assembly's efforts over many years to achieve statewide parity of property valuation for tax assessment purposes. Unless all county assessors value taxable property in their respective counties at approximately the same percentage of its actual valuation, the property tax falls more heavily, and therefore unfairly, on those who own property in counties where the assessors have followed the legislative mandate. Therefore, in balancing the equities for due process purposes, one factor we consider is that the 1976 Act apparently is a one-time "catch-up" provision designed to force county assessors who habitually have undervalued property to evaluate and assess on the same basis as other counties. It should be noted that this opinion must be read in the context of this 1976 Act and its limited application.

 We recognize, too, that the due process standard is less stringent where the threatened taking involves property rights than where it involves personal liberty. Thus in a situation analogous to this case, the United States Supreme Court observed:

"Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate. . . . [citing cases]. Delay in the judicial determination of property rights is not uncommon where it is essential that governmental needs be immediately satisfied. . . ." *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589, 596-97, 51 S.Ct. 608, 611, 75 L.Ed. 1289, 1297 (1931). *See also Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 611, 94 S.Ct. 1895, 1902, 40 L.Ed.2d 406, 416 (1974).

The gist of the due process argument, asserted on behalf of taxpayers by the respondents and amici curiae, is that a taxpayer who might be unfairly treated when the assessor makes the adjustment in his assessment as required by the statute, will have no right to a hearing and judicial review *before* paying the tax.[14] Stated more broadly, the due process issue is

---

[14] Of course, this assumes that one or more of the respondent assessors will unfairly assess individual properties, an assumption which is premature at best. Moreover, a taxpayer who might claim his property assessment has received a disproportionately high upward adjustment cannot complain unless he can show that *after* the adjustment his property is substantially overassessed.

whether the total statutory scheme provides an adequate opportunity to contest and appeal an upward adjustment in an assessment when the adjustment was not a result of the assessor's original valuation for that year but was required after review by the State Board.

The statutes provide in detail for a notice, protest and appeal procedure through which a taxpayer may contest a county assessor's *original* assessment and obtain judicial review if desired. Sections 39-5-122, 39-5-129, 39-8-102 to 109, C.R.S. 1973. This procedure, however, does not apply here, not only because the times specified in the statute have passed, but also because here we do not deal with an assessor's original assessments. Rather the potential increases here in contention will result from adjustments ordered by the State Board rather than original assessments.

Where a tax is erroneously or illegally levied, the statutes, through an abatement and refund procedure, provide the taxpayer a right to protest to the county treasurer and a full hearing before the county commissioners followed by access to the courts after exhausting the statutory administrative remedies. *See* sections 39-1-113 and 39-10-114, C.R.S. 1973. One of the grounds for abatement or refund expressed in section 39-10-114 is "erroneous valuation for assessment." For the reasons discussed below, we hold that this procedure fully protects the due process rights of taxpayers adversely affected by the 1976 Act and the State Board order.

In an analogous situation involving the federal income tax, the Supreme Court held that due process was not denied by requiring a taxpayer to pay the tax and claim a refund as a prerequisite to litigating the validity of the tax. *Dodge v. Osborn*, 240 U.S. 118, 120-22, 36 S.Ct. 275, 276-77, 60 L.Ed. 557, 559-560 (1916). As stated in *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589, 595, 51 S.Ct. 608, 611, 75 L.Ed. 1289, 1296 (1931):

"Where, as here, adequate opportunity is afforded for a later judicial determination of the legal rights, summary proceedings to secure prompt performance of pecuniary obligations to the government have been consistently sustained. [Citing cases.] Property rights must yield provisionally to governmental need. . . ."

In *Phillips* the Court held: "Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of the liability is adequate." *Id.* at 596-97, 51 S.Ct. at 611, 75 L.Ed. at 1297.[15]

Similarly, where a taxpayer complained that the county assessor had failed to give the required timely notice of an increased assessment, thus depriving it of its statutory right to litigate validity of the assessment

---

[15] This holding of the *Phillips* case has recently been cited with approval in *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 611, 94 S.Ct. 1895, 1902, 40 L.Ed. 406, 416 (1974) and *Fuentes v. Shevin*, 407 U.S. 67, 92 n. 24, 92 S.Ct. 1983, 2000, 32 L.Ed.2d 556, 576 (1972).

before paying the tax, no federally guaranteed rights were abridged because the Colorado statutes allowed the "plain, adequate and complete" remedy of litigating the right to a refund after paying the taxes. *Singer Sewing Machine Co. v. Benedict*, 229 U.S. 481, 33 S.Ct. 942, 57 L.Ed. 1288 (1913).

This court has consistently held that failure to provide a hearing and review before adjustments by the State Board of Equalization take effect "does not constitute a deprivation of property without due process of law." *E.g., People v. Hively*, 139 Colo. 49, 59, 336 P.2d 721, 727 (1959). *See also Colorado Tax Commission v. Pitcher*, 56 Colo. 343, 369, 138 P. 509, 518 (1914) where we declared the rule that "actual notice to the individual taxpayer is not required as a condition precedent to action by state boards of equalization. . . ."

In the very recent case of *Modular Communities, Inc. v. McKnight*, 191 Colo. 101, 550 P.2d 866 (1976), we rejected a contention similar to that here urged. There the taxpayer, in May, 1971, had received from the county assessor a mailed notice that the assessed valuation on its mobile home park was $192,320. However, on January 1, 1972, the taxpayer received a tax bill indicating the tax was based on an assessed valuation of $352,050. Upon inquiry, the taxpayer was told that the $159,730 increase in assessed valuation was correct and the notice it had received seven months earlier had been erroneous. The taxpayer paid the tax and filed a district court action seeking a refund. It complained that the seven-month delay in giving notice of the increased assessment deprived it of the normal procedures for protest and review. This court held, however, that the abatement and refund remedies provided after payment of the tax are adequate where the taxpayer's "knowledge of the excessive charge is acquired subsequent to the usual statutory deadlines for protest." 550 P.2d at 867, citing the predecessor of section 39-10-114, C.R.S. 1973. In our view these abatement and refund remedies are likewise adequate to answer the due process questions raised here.

The respondent assessors and amici curiae argue, however, that the taxpayer's right, after the assessor raises his assessment in response to a State Board order, to seek abatement or refund, is not adequate because the taxpayer is not afforded an opportunity to contest an assessment increase which the taxpayer claims is higher than it should be but which is admittedly not "illegal" or "erroneous." They argue that the procedures for protesting an *original* assessment allow taxpayers to dispute the assessor's valuation on the mere ground that it is too high, and that due process is denied in the statutory abatement and refund procedure because it allows litigation only if the taxes have been levied "erroneously or illegally." Section 39-10-114, C.R.S. 1973.

For this proposition the respondents rely on a dictum in *Northcutt v. Burton*, 127 Colo. 145, 254 P.2d 1013 (1953). There, in interpreting the

predecessor of section 39-10-114,[16] this court said: "The term 'erroneous assessment' as used in this section, implies more than mere over-assessment and refers to a tax levy that for any reason is wholly illegal or invalid." 127 Colo. at 152, 254 P.2d at 1017. However, no such issue was before the court in that case. *Northcutt* was a taxpayers' suit seeking to prohibit county officers from enforcing an allegedly void property reap-praisal. It was not a tax abatement or refund action, and thus the court was not called upon to decide the scope of section 39-10-114's predecessor section.[17]

 The statute in plain terms clearly provides administrative reme-dies for correction of any substantial injustice resulting from "erroneous valuation for assessment" of a taxpayer's property. These remedies are made available both before and after payment of the tax. The statute pro-vides:

"Abatement, cancellation of taxes. (1) If taxes have been levied errone-ously or illegally, whether due to erroneous valuation for assessment, ir-regularity in levying, or clerical error, the treasurer shall report the amount thereof to the board of county commissioners, who shall proceed to abate such taxes in the manner provided by law. If such taxes have been collected by the treasurer, the board of county commissioners shall author-ize refund of the same in the manner provided by law." Section 39-10-114(1), C.R.S. 1973.

In addition, section 39-1-113 provides the taxpayer a hearing on his abate-ment and refund claim before the county commissioners. Upon exhaustion of these administrative remedies, the taxpayer may file suit in district court. Normally, by the time this occurs, the tax due date will have ar-rived, and therefore, the usual procedure is to pay the tax under protest and sue for a refund. *Holly Sugar Corp. v. Board of Commissioners*, 10 F.2d 506, 507 (D. Colo. 1926); *Kendrick v. A.Y. & Minnie Mining & Milling Co.*, 63 Colo. 214, 164 P. 1161 (1917).

 Due process does not require that exactly the same procedures and remedies be afforded one who pays the tax and then seeks a refund as are granted to one who litigates before paying the tax. For example, the federal income, estate and gift tax laws provide an administrative review in the Internal Revenue Service followed by a non-jury trial in the tax court *prior* to paying the tax, but to gain access to the United States Dis-trict Court or obtain a jury trial, the taxpayer must pay the tax and sue for a refund.[18]

---

[16] Section 281, chapter 142, '35 C.S.A.
[17] *Id.*
[18] *Compare* 26 U.S.C. § § 6212, 6213 (1970) (Int. Rev. Code 1954), *with* 28 U.S.C. § 1346 (a)(1) (1970).

■ We decline to follow the dictum in *Northcutt* which narrowly restricted the abatement and refund remedies, since section 39-10-114 in plain language allows an abatement and refund remedy based on an "erroneous valuation for assessment."[19] Therefore, the abatement and refund remedy is plenary, and no due process denial is here involved.

Practical considerations, as well as constitutional law principles, support the result here reached. The respondent assessors' argument boils down to the contention that individual taxpayers' respective assessed valuations cannot be adjusted upward by the county assessor following State Board review of the county assessment roll, without according every taxpayer the full panoply of month-by-month protest and statutory review procedures provided following each year's assessment. Not only because of the time schedules involved, but also because of the sheer number of the taxpayer, such a rule would impose impossible obligations on taxing authorities.

As Mr. Justice Holmes declared in *Bi-Metallic Co. v. Colorado*, 239 U.S. 441, 445-46, 36 S.Ct. 141, 142, 60 L.Ed. 372, 375 (1915):
"Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly or the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. . . . There must be a limit to individual argument in such matters if government is to go on."

A writ in the nature of mandamus is appropriate. The rule is made absolute.

MR. JUSTICE GROVES specially concurs.

MR. JUSTICE KELLEY does not participate.

MR. JUSTICE GROVES specially concurring:

I concur with the opinion except that I am not at this time prepared to concur in the part thereof relating to standing.

---

[19] *Northcutt's* dictum apparently followed the interpretation of section 281, chapter 142, '35 C.S.A., set forth in *South Broadway Nat'l Bank v. Denver*, 51 F.2d 703 (10th Cir. 1931). We are not bound, however, by a federal court's interpretation of a Colorado statute. Nor are we bound by the similar dicta in *First National Bank v. Patterson*, 65 Colo. 166, 174, 176 P. 498, 501 (1918).